## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------

Litigation Support Services, LLC,   :
             :
      Plaintiff,  :
             :  No. 2:19-CV-01574-ER
     v.       :
             :
Arkadiy Lymapert, Elena Lyampert,  :
Anna Lyampert, EAA Investments, LLC, :
VRLA Tech, LLC, Valley View Grantor :  JURY TRIAL DEMANDED
Retained Income Trust, and Second  :
Valley View Grantor Retained Income  :
Trust,            :
      Defendants. :

## <u>ORDER</u>

NOW, this _____ day of _____, 2019, upon consideration of

Defendants' Motion to Dismiss, Defendants' Motion to Disqualify, and Plaintiff's Cross-Motion

for Protective Order, any opposition thereto, oral argument, and the record as a whole,

IT IS this _____ day of _____, 20_____,

IT IS ORDERED that the Motion for Protective Order is GRANTED; and

IT IS FURTHER ORDERED Defendant's Motion to Dismiss is DENIED without

prejudice pending resolution of the Motion to Compel Arbitration; and

IT IS FURTHER ORDERED that Defendant's Motion to Disqualify is DENIED without

prejudice pending resolution of the Motion to Compel Arbitration.


Dated:            _____


                    J.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| Litigation Support Services, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. 2:19-CV-01574-ER |
| v. | : | |
| | : | |
| Arkadiy Lymapert, Elena Lyampert, | : | |
| Anna Lyampert, EAA Investments, LLC, | : | |
| VRLA Tech, LLC, Valley View Grantor | : | JURY TRIAL DEMANDED |
| Retained Income Trust, and Second | : | |
| Valley View Grantor Retained Income | : | |
| Trust, | : | |
| Defendants. | : | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND DISQUALIFY, AND PLAINTIFF'S CROSS-MOTION FOR PROTECTIVE ORDER

Plaintiff, by and through its undersigned counsel, Bochetto & Lentz, P.C., hereby submits the following Response in Opposition to Defendants' Motions to Dismiss and Disqualify, and Plaintiff's Cross-Motion for Protective Order.

As set forth in Plaintiff's Memorandum of Law, which is incorporated herein by reference, Plaintiff respectfully request the Court to deny Defendants' Motions and enter the Protective Order requested herein.

**WHEREFORE,** Plaintiff's respectfully request the Court to enter an order denying

Defendants' Motions and entering a Protective Order on behalf of Plaintiff.

Respectfully Submitted,

**BOCHETTO & LENTZ, P.C.**

Dated:  <u>May 2, 2019</u>                  BY:      <u>*/s/ George Bochetto, Esquire*</u>
George Bochetto, Esquire
David P. Heim, Esquire
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------

| | | |
|---|---|---|
| Litigation Support Services, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. 2:19-CV-01574-ER |
| v. | : | |
| | : | |
| Arkadiy Lymapert, Elena Lyampert, | : | |
| Anna Lyampert, EAA Investments, LLC, | : | |
| VRLA Tech, LLC, Valley View Grantor | : | JURY TRIAL DEMANDED |
| Retained Income Trust, and Second | : | |
| Valley View Grantor Retained Income | : | |
| Trust, | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND DISQUALIFY AND PLAINTIFF'S CROSS-MOTION FOR PROTECTIVE ORDER**

Plaintiff, by and through its undersigned counsel, Bochetto & Lentz, P.C., in support of its Response in Opposition to Defendants' Motions to Dismiss and Disqualify and in support of its Cross-Motion for Protective Order, avers as follows:

## INTRODUCTION

Defendants bring its Motions in a clear effort to thwart efficient resolution of this dispute. Not only is this dispute subject to arbitration, which Defendants are actively seeking to avoid, but Defendants are clearly subject to personal jurisdiction by virtue of the arbitration agreement alone. Defendants specifically discussed that, in the event of a dispute, arbitration would be held in Pennsylvania or in California.  As the arbitration issue speaks to this Court's power over the remainder of the motions, that issue should be decided first.

In the event that this Court reaches the issue, the facts in support of personal jurisdiction over Defendants are overwhelming. At the outset, Plaintiff entity was formed in Pennsylvania

1

**for the sole purpose** of fulfilling contractual obligations with Defendants. This formation occurred after months of discussion between Plaintiff's managing member, Andrew Mogilyansky, and Defendants – **all of which occurred in Philadelphia.** Defendant was aware that Mr. Mogilyansky was a Pennsylvania citizen, the first four months of the parties' business relationship was conducted exclusively in Philadelphia, the initial contract was negotiated and executed in Philadelphia, and the bulk of Plaintiff's services were performed in Philadelphia. The provisions of the latest agreement between the parties, the LTA, provide for the possibility of Plaintiff's Pennsylvania-based attorney choosing the "method" of arbitration, which necessarily includes the location. Furthermore, Plaintiff LSS was paid in Pennsylvania directly from the U.K., without any California interaction at all.

There is no reasonable interpretation of the parties' relationship whereby Defendants did not knowingly avail themselves to the protections and benefits of Pennsylvania law. Thus, grounds for exercising personal jurisdiction over Defendants are clear, and Defendant's Motion to Dismiss must be denied.

Additionally, Defendants seek to disqualify Plaintiff's counsel as a purely procedural trick. Mr. Bochetto, Plaintiff's counsel, never represented Defendants, and Defendants can point to no fact in support of their motion. The alleged documents they possess describe potential advance payments; in their one meeting with Mr. Bochetto they communicated nothing to him and he expressly declined to represent or assist them; and there is no substantial relationship between that meeting and this dispute.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a business relationship between Litigation Support Services, LLC ("LSS", "Plaintiff"), a Pennsylvania-based consultancy operated by Andrew Mogilyansky ("Mogilyansky"), and the California-based family of Arkadiy, Elena and Anna Lyampert, their

2

business entities, and their trusts (together, the "Lyampert Group" or the "Defendants").

**I.      Transactions of the Parties Pursuant to a Consulting Agreement**

For approximately 2.5 years ending in mid-2018, Mogilyansky, through LSS, provided consulting services ("LSS Services") to the Lyampert Group and their respective attorneys. LSS Services related principally to UK and US litigation ("Frenkel Litigation") between Arkadiy Lyampert ("Lyampert") and Roman Frenkel ("Frenkel"), and to Lyampert's contested interest in LA Micro Group UK, Ltd. ("LAMUK"), a successful UK-based business.

The Frenkel Litigation included multiple proceedings in the US starting in 2010 ("US Proceedings") and in the UK starting in 2015 ("UK Proceedings"). At the heart of the US Proceedings was a dramatic 2010 falling out between Lyampert and Frenkel in relation to their business, LA Micro Group, Inc. ("LAMG"). As of late 2015 - early 2016, the Frenkel Litigation was going poorly for Defendants, and they decided to engage the services of Plaintiff.

Mr. Mogilyansky, Plaintiff's managing member, and Mr. Lyampert had been in contact for years. As the UK proceedings were beginning, Mr. Lyampert reached out to Mr. Mogilyansky for support during the litigation process. See Affidavit of Andrew Mogilyansky, attached hereto as Exhibit "A."

After Mr. Lyampert reached out to Mr. Mogilyansky to engage his services, Mr. Lyampert flew out to Philadelphia four times – each for the specific purpose of obtaining said services. *Id.* During these meetings, all of which occurred in or near Philadelphia, the parties negotiated and eventually executed the terms of the Engagement Letter. *Id.*

The first meeting between the parties took place in January, 2016, when Mr. Lyampert stopped in Philadelphia on his way to England (in connection with the UK component Frenkel litigation that underpins this lawsuit).  *Id.* ¶ 115.  Mr. Lyampert and Mr. Mogilyansky spent two

full days together, during which, as well as during subsequent weeks and months, Mr. Mogilyansky provided support in engaging English counsel, which was quickly followed by Mr. Mogilyansky work with said counsel. *Id.*

The second meeting took place in March, 2016, when Mr. Lyampert traveled to Philadelphia and spent several days strategizing with Mr. Mogilyansky. *Id.* During this time, Mr. Lyampert agreed to arrange for his company, LAMUK, to hold its next board meeting in Philadelphia. *Id*. Finally, it was during this time that **Mr. Lyampert and Mr. Mogilyansky agreed that Mr. Mogilyansky would form the commercial entity Litigation Support Services, LLC** (the Plaintiff in this matter) **for the purpose of providing litigation support to Defendants.** *Id.*

Subsequently, Mr. Lyampert's company, LAMUK, held a board meeting in Philadelphia, *hosted by Plaintiff*, in April 2016, which was attended by Mr. Lyampert and his partner from the U.K. During this visit, and on the same evening as the LAMUK board meeting was concluded, Mr. Lyampert and Mr. Mogilyansky concluded their negotiations for Plaintiff's services. *Id.* These discussions occurred in Richboro, Pennsylvania, and the parties ultimately agreed that Plaintiff would be compensated for its help in the UK proceedings, at the rate of $8,000 per month, including retroactive payments. *Id.* ¶ 115(c).

At all times, payments were made to Plaintiff in this judicial District. *Id.* ¶ 133.

The terms of the above negotiations were further put in writing in Philadelphia. Mr. Lyampert and his wife, Defendant Elena Lyampert, flew to Philadelphia in late April, 2016. *Id.* During this visit the parties drafted and executed the Engagement Letter in Southampton, PA. *Id.*

Over the two-and-a-half-year course of the parties' contractual relationship, Defendants traveled to the Philadelphia area approximately eleven times, while Plaintiff traveled to

California a total of five times. *Id.* ¶119 (setting forth specific dates between 2016 and 2018). Plaintiff performed the great majority of its services for Defendants in Pennsylvania. *Id.* ¶ 133.

Importantly, the Lyamperts flew to Philadelphia between approximately April 23 and 25, 2016, their third trip to Philadelphia that year, in part to meet with LSS regarding litigation support issues. *Id.* ¶¶ 29-30. As part of those meetings, the Engagement Letter was executed in Pennsylvania by Defendant Arkadiy Lyampert. *Id.* ¶¶ 115-18.

Further, the parties specifically negotiated Section 12 of their subsequent Long Term Agreement ("the LTA") upon **Defendants' request**. *Id.* Defendants specifically discussed the arrangement that, in the case of a dispute, a coin-toss would determine if arbitration would take place **in Pennsylvania** or California. *See* Def. Mot. Ex. B ¶ 12 (Long Term Agreement). The forum selection mechanism was insisted upon by the Defendants. *Id.* ¶ 124. The parties expressly discussed the possibility of California and Pennsylvania venues for their disputes as part of LTA negotiations. *Id.* ¶¶ 127-28.

II.   **Mr. Bochetto's Limited Contact With Defendants on an Unrelated Matter in Which He Did Not Represent or Advise Them**

Mr. Bochetto has represented Andrew Mogilyansky, the principal of Plaintiff, since 2009. Mr. Mogilyansky called Mr. Bochetto about Mr. Mogilyansky's potential real property investment on April 26, 2016. *See* Bochetto Aff. ¶¶ 9, 11, attached hereto as Exhibit "B." Mr. Bochetto provided advice to Mr. Mogilyansky at that time concerning Mr. Mogilyansky's personal interest in the potential real estate project and no one else was on the call. *Id.* ¶¶ 9-18.

Mr. Bochetto did arrange an in-person meeting at his office — located in Philadelphia, Pennsylvania — for Mr. Mogilyansky and other persons involved in the potential transaction on April 28, 2016. *Id.* ¶¶ 18-19. Defendants Arkadiy Lyampert and Elena Lyampert attended the meeting. *Id.* ¶ 19. Mr. Bochetto never had any other contact with them. *Id.*

Mr. Bochetto understood that Mr. Mogilyansky, his client, was operating at "arms-length" in the real estate transaction with the Lyamperts concerning a Pennsylvania partnership. *Id.* ¶¶ 21, 23.  Mr. Bochetto understood that he was providing advice only to Mr. Mogilyansky, because the transaction was "arms-length."  *Id.* ¶¶ 22, 23, 26, 27.  Mr. Bochetto learned no information from the Lamperts about the prospective real estate transaction.  *Id.* ¶¶ 22, 28.

When asked by Mr. Mogilyansky about advising both Mr. Mogilyansky and the Lyamperts together, Mr. Bochetto rejected the idea outright.  *Id*. ¶¶ 29-30.

Mr. Bochetto took another meeting with Mr. Mogilyansky about the mortgage a short while later, solely from Mr. Mogilyansky about a mortgage and promissory note.  *Id.* ¶ 33.

Mr. Bochetto's bills on these occasions indicate only one client, Mr. Mogilyansky, as distinct from the Lyamperts, and they are consistent with the actual discussions.  *Id.* ¶¶ 34-38. Mr. Bochetto never did any work for the Lyamperts and was never retained by them.  *Id.* ¶¶ 40-46.

Mr. Mogilyansky was approached by the Lyamperts regarding the prospective Pennsylvania real property transaction in January 2016, when Mr. Lyampert flew to Philadelphia to meet with Plaintiff.  Ex. A ¶ 15.   Another in-person meeting occurred between Mr. Mogilyansky and Mr. Lyampert in March 2016.  *Id.* ¶ 18.

On April 19, 2016, Mr. Lyampert called LSS concerned about a newly issued California decision.  *Id.* ¶ 26.  Mr. Mogilyansky affirms that he sought Mr. Bochetto's advice on the effect of the California decision on the real property transaction on April 26, 2016.  *Id.* ¶¶ 32-33. Based on that call, a further meeting was scheduled with Mr. Bochetto by Mr. Mogilyansky.  *Id.* ¶¶ 37-38,

6

The advice on the real estate deal was only one of the many issues on which Mr. Mogilyansky consulted Mr. Bochetto in 2016.  *Id.* ¶ 39.  Because Mr. Mogilyansky understood Mr. Bochetto to be his attorney, and because he did not intend to disclose any confidential information to Mr. Bochetto, he did not believe that attending the meeting with the Lyamperts could endanger his relationship with Mr. Bochetto. Accordingly, Mr. Mogilyansky brought the Lyamperts to a meeting between him and Mr. Bochetto on April 28, 2016.  *Id.* ¶¶ 40-47.  In any case, the Lyamperts did not participate in the meeting in any meaningful sense, and Mr. Mogilyansky discussed the effect of the California decision on the potential real estate deal with Mr. Bochetto as **regarded Mr. Mogilyansky's own personal interest**.  *Id.* ¶¶ 48-52.  When Mr. Lyampert inquired at the end of the meeting whether Mr. Bochetto could assist him, Mr. Bochetto immediately declined on the basis of a conflict of interest.  *Id.* ¶¶ 53-58.

Although Mr. Lyampert discussed retaining Mr. Bochetto with Mr. Mogilyansky later, Mr. Lyampert quickly declined to pursue it.  *Id.* ¶ 64.  Mr. Mogilyansky utilized Mr. Bochetto's advice only once more in the Pennsylvania real estate transaction.  *Id.* ¶¶ 69-71.  Mr. Mogilyansky required the Lyamperts or EAA to reimburse him for the costs of the additional legal advice necessitated by the California decision, and the Lyamperts agreed.  *Id.* ¶¶ 76-82.

LSS retained Mr. Bochetto in January 2019 to address the Defendants' failure to honor their contract with LSS, when the instant dispute started, which is unrelated to the real estate transaction discussed in 2016 (in which Mr. Bochetto also only advised Mr. Mogilyansky).  *Id.* ¶ 73.  Until 2019, Mr. Bochetto did not hear about any developments in the Defendants' case.

Plaintiff filed its Complaint and accompanying exhibits, detailing the above facts, on March 14, 2019. A true and accurate copy of Plaintiff's Complaint is attached hereto as Exhibit

"C." Defendants filed a Notice of Removal before this Court on April 11, 2019. Defendants further moved to dismiss this Action, or alternatively transfer venue, on April 18, 2019.

## LEGAL ARGUMENT

## I.    Specific Personal Jurisdiction Is Satisfied Over Defendants

When the defendant makes a facial challenge to jurisdiction, relying on the complaint and the documents attached thereto, the allegations of the complaint and the attached document are accepted as true and considered in the light most favorable to the plaintiff. Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). Under Rule 12(b)(6), "the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs, and determining whether they state a claim as a matter of law." Id. at 178.

The plaintiff must sustain its prima facie case for personal jurisdiction through a preponderance of the evidence. Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992).

Federal courts may assert personal jurisdiction over nonresident defendants "to the extent permissible under the law of the state where the district court sits." *Pennzoil Prods. Co. v. Colelli & Ass's, Inc.*, 149 F.3d 197, 200 (3d Cir. 1998) (internal quotations omitted).

Pennsylvania's long-arm statute "permits Pennsylvania courts to exercise personal jurisdiction over nonresident defendants 'to the constitutional limits of the Due Process Clause of the Fourteenth Amendment.'" *Id.* (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1220, 1221 (3d Cir. 1992)). "A district court's exercise of personal jurisdiction pursuant to Pennsylvania's long-arm statute is therefore valid as long as it is constitutional." *Id.* (citing *Farino*, 960 F.2d at 1221). Of course, jurisdiction may be general or specific in nature. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

To support a finding of specific jurisdiction, due process requires the plaintiff to show that: (1) the defendant "purposefully directed its activities at the forum," (2) the litigation arises out of or relates to at least one of those activities, and (3) the exercise of jurisdiction "otherwise comports with fair play and substantial justice." *Allaham v. Naddaf*, 635 Fed. App'x 32, 39 (3d Cir. 2015) (unreported) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *O'Connor v. Sandy Lane Hotel Co.*, 486 F.3d 312, 317 (3d Cir. 2007)).

The "proper focus of the 'minimum contacts' inquiry" is "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014) (quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984)). Even if a defendant did not take any physical actions in the forum, the defendant's out-of-state conduct at issue in the litigation may nevertheless create a sufficient relationship between the defendant and the forum to support personal jurisdiction. *Calder v. Jones*, 465 U.S. at 788.

As the Third Circuit has held, "[s]pecific jurisdiction over a defendant exists when that defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Miller Yacht Sales, Inc.*, 384 F.3d at 96 (internal quotations omitted).

### a.  Defendants Purposefully Directed Their Activities at Pennsylvania

To satisfy this element, Plaintiffs must only show, by a preponderance of the evidence, Defendants' "deliberate targeting of the forum." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).

Here, Defendants readily admit that they engaged the services of Plaintiff, a Pennsylvania entity, and Mr. Mogilyansky, a Pennsylvania citizen. As Defendants admit, Mr. Lyampert "had

known Mr. Mogilyansky [Plaintiff's managing partner] since 2004 or 2005" before engaging his services in 2015. See Defendant's Motion to Dismiss at 2. Mr. Mogilyansky is a Pennsylvania citizen, a fact known to his long-time acquaintance Mr. Lyampert.  *See* Def. Br. at 4 (quoting Lyampert stating, "I understood that Plaintiff had a business office in Pennsylvania . . .").  Litigation Support Services, LLC is a Pennsylvania entity, a fact also known to Mr. Lyampert from his relationship with Mr. Mogilyansky.  Having full knowledge of these facts, Defendants engaged a Pennsylvania entity to provide litigation support services.

Defendant's admissions alone make it clear that Defendants purposefully directed their activities at Pennsylvania. Even if all that Defendants simply used was mail and telephone calls to engage the services of a Pennsylvania citizen, that would be enough to establish purposeful availment.  *O'Connor v. Sandy Lane Hotel Co., Ltd*., 496 F.3d 312, 318 (3d Cir. 2007) (finding that, by mailing seasonal newsletters and trading phone calls with two Pennsylvania citizens for the purpose of forming an agreement to render spa services, a Defendant deliberately reached into Pennsylvania to target its citizens and thus established purposeful contact).

However, it is the facts which Defendants **fail** to mention that show the full extent of their activities in this jurisdiction.

Perhaps most telling, the initial Engagement Letter between Mr. Lyampert and Plaintiff was, in fact, executed in Pennsylvania as described above. Ex. A ¶ 118.  Mr. Lyampert flew out to Philadelphia, exclusively, during the first four months of the parties' relationship (*id.* ¶ 115), and then on multiple occasions thereafter.  *Id.* ¶119 (setting forth specific dates between 2016 and 2018).  The terms of the Engagement Letter were negotiated in Pennsylvania, executed in Pennsylvania, and paid in Pennsylvania. The LTA was executed by Mr. Mogilyansky in Pennsylvania, and payments under the LTA continued in Pennsylvania. The determination of

purposeful availment looks at these very factors, including "the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing," as well as whether the parties "contemplated future consequences." *Mendelsohn, Drucker & Associates v. Titan Atlas Mfg., Inc*., 885 F.Supp.2d 767, 773 (E.D. Pa. 2012) (quoting *Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir.2001)); *Mellon Bank (E.) PSFS, Nat. Association v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).

*Mellon Bank* is particularly instructive.  The Third Circuit Court of Appeals described the nonresident defendants' actions as follows:

> The defendants here purposefully availed themselves of the privilege of conducting business in the Commonwealth. They were all well aware, or should have been, that they were dealing with a Pennsylvania bank. The guaranty and suretyship agreements, which they all signed, and the notes that those guaranties backed indicated that Mellon was a Pennsylvania entity. Payments on the notes and on the guaranties, if necessary, and any other correspondence were to be sent to Mellon's Philadelphia address. The defendants also provided personal net worth documentation to Mellon, initially through the mortgage broker and then directly to the bank in Pennsylvania, in the hope that, first, someone in the Commonwealth would approve the financing that the partnerships sought, and later, that Mellon would extend the due date of those obligations.

960 F.2d at 1223.  Defendants conducted themselves in a similar manner.  Furthermore, in *Mellon Bank*, the defendants first approached the bank through a Washington, D.C., branch, and the court found that not to relate to the defendants' choice to do business with a Pennsylvania entity.  *Id*.  It was apparent from the very Engagement Letter itself executed between the parties here, at the Pennsylvania address on the bottom of the first page of the Engagement Letter itself, that Defendants knew that they had chosen to do business in Pennsylvania; they cannot avoid this now.  Def. Mot. to Dismiss at Ex. A.

The Plaintiff entity was formed, in Pennsylvania, for the purpose of providing litigation support services to the Defendants.  Ex. A ¶ 115(b).  In addition, the bulk of the parties' in-

person meetings occurred in this jurisdiction, including the bulk of board meetings of LAMUK, shareholders and directors of which, including Mr. Lyampert, purposefully flew to Philadelphia so that Plaintiff LSS could conduct their board/shareholder meetings. While Defendants argue, falsely, that the bulk of the parties' meetings occurred in California, such an assertion, even if true (it is not), is irrelevant for purposes of personal jurisdiction. "Physical entrance is not required [under the element of purposeful availment]." *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 317 (3d Cir. 2007).

Finally, the parties specifically discussed that Section 12 of the LTA would require Defendants to submit to arbitration in either California or Pennsylvania, in which Defendants certainly "contemplated future consequences" of subjecting themselves to Pennsylvania's jurisdiction. Although the Defendants argue in their brief that "there is no forum-selection clause designating Pennsylvania," the actual language of the LTA itself contains a forum selection procedure:

> LSS and Clients will strive to find amicable solutions to all situations which may arise in their relationship with each other. If LSS and Clients have a disagreement, they will first try to resolve it through good faith negotiations. If the disagreement cannot be amicably resolved through negotiations, LSS and Clients will arrange for informal mediation to be conducted by Jeff Farrow, Esq. and George Bochetto, Esq. via telephone or video conference. If this mediation proves unsuccessful, LSS and Clients will submit to binding arbitration in an arbitration venue and forum chosen by Mr. Farrow and Mr. Bochetto. If Mr. Farrow and Mr. Bochetto cannot agree on the method of arbitration, each of them will suggest one, and it will be decided by coin toss to be performed by Mr. Farrow.

Def. Mot. Ex. B ¶ 12 (Long Term Agreement). Mr. Bochetto's offices are located in Philadelphia. *See* Ex. B ¶ 1. Mr. Farrow is a California attorney. *See* Ex. D at Ex. H, Mogilyansky Aff. ¶ 15. The forum selection procedure contemplated that the venue choice could be made by an attorney located in Philadelphia, Pennsylvania, and thus constitutes a waiver of

personal jurisdiction as to all Defendants (all are signatories to the LTA, *see* Def. Mot. Ex. B). "Personal jurisdiction is, however, a waivable right, and litigants can give express or implied consent to the personal jurisdiction of the court through a variety of legal arrangements, including forum selection clauses in contracts executed by the parties." *Skold v. Galderma Labs.*, L.P., 99 F. Supp. 3d 585, 605 (E.D. Pa. 2015) (internal quotations omitted).   As there is no doubt that the claims in this matter arise out of or are closely related to the LTA, Defendants undoubtedly waived an objection to personal jurisdiction in Pennsylvania through the LTA itself. *Id.* at 608-09.

Despite the clear support of law and fact in favor of this Court exercising personal jurisdiction, Defendants have circumvented their obligation to participate in Arbitration by filing the present Motion to Dismiss.

### b.  The Underlying Litigation Arises Out of or Relates to Defendant's Activities in the Forum

There is no bright-line test to establish the relatedness of a parties' contacts to the underlying claim – Plaintiff must simply show by a preponderance of the evidence that Defendants' contacts with Pennsylvania are the but-for cause of the underlying litigation in this matter, and that it would be fair and reasonable for Defendant to foresee such causation. *O'Connor v. Sandy Lane Hotel Co., Ltd*., 496 F.3d 312, 323 (3d Cir. 2007).

This element is easily established. The underlying litigation arises from the contractual relationship between Plaintiff and Defendant, the formation of which is the basis for specific jurisdiction over Defendants. All of the meetings, negotiations, and services described above as constituting purposeful availment are at the very heart of the underlying breach of contract claims in this case.

13

It is, of course, absurd for Defendants to suggest that there is no personal jurisdiction over Defendants when *Plaintiff's very existence* arises out of Mr. Lyampert's business dealings with Mr. Mogilyansky.

### c.   The Exercise of Jurisdiction Comports with Fair Play and Substantial Justice

This factor does not necessarily need to be satisfied in every case – and this situation is one in which it does not need to be satisfied. "Once the plaintiff has made a prima facie case for jurisdiction based upon minimum contacts, the burden falls upon the defendant to show that the assertion of jurisdiction is *unconstitutional*. This burden is met when the defendant demonstrates to the court that factors are present that make the exercise of jurisdiction unreasonable." *Mellon Bank (E.) PSFS, Nat. Association v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992). Plaintiff has laid out a clear prima facie case for the exercise of personal jurisdiction over Defendants, and thus the burden has shifted to Defendant to show why jurisdiction would be unreasonable.

Even so, it is clear that notions of fair play and substantial justice are not violated by subjecting Defendants to Pennsylvania's jurisdiction. Factors to be analyzed under this element include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Mellon Bank (E.) PSFS, Nat. Associationn v. Farino*, 960 F.2d 1217, 1222 (3d Cir. 1992).

The most efficient relief available to the parties, by far, is participation in the agreed-upon arbitration contemplated in the parties' contract. Plaintiff's sole interest in filing this case at the outset was to enforce arbitration and resolve this dispute quickly and efficiently.  Ex. A. ¶¶ 137-38.  Additionally, as argued in our previous Motion to Compel, there is a strong federal

14

policy in favor of enforcing arbitration. *AT&T Techs., Inc. v. Comms. Workers of America*, 475 U.S. 643, 649 (U.S. 1986).

## II.     Venue Is Proper and Forum Non Conveniens Does Not Apply

Defendants assert that venue is improper in this Court under Rule 12(b)(3), or, in the alternative, that they are entitled to have this case moved to California.  Neither proposition succeeds here, where Defendants hired a Pennsylvania contractor.

The Defendants bear the burden in raising a 12(b)(3) challenge to improper venue. *Liberty Woods Int'l, Inc. v. Motor Vessel Ocean Quartz*, 219 F. Supp. 3d 494, 497 (D.N.J. 2016), *aff'd*, 889 F.3d 127 (3d Cir. 2018).  Under the relevant portion of 28 U.S.C. § 1391, venue lies in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]"

Plaintiff easily meets its burden in showing that a substantial amount of the work done for Defendants was done in this judicial District.  Defendants came here on no less than eleven occasions to meet with the Plaintiff.  Ex. A ¶ 119.  Negotiations took place in this judicial district over the agreements at issue.  Ex. A ¶¶ 115-19.  The agreement that anchored the entire relationship, the Engagement Letter, was signed here. A vast amount of work was done in this district on under the agreement between the parties: of over 2.5 years of effort, more than 6,500 emails exchanged, the review of tens of thousands of pages of documents, phone calls and videoconferences, in-person meetings, board/shareholder meetings attended by Defendants' counterparts from England, and substantive negotiations in the work performed by LSS all occurred in this District, in which Plaintiff maintains its office.  Ex. D ¶ 28.  In the words of Mr. Mogilyansky:

> I did the vast bulk of my work for the Lyamperts in
> Pennsylvania. I had most of my in-person meetings in Pennsylvania,

> all of which were attended by Mr. Lyampert. In particular, virtually all LAMUK-related meetings took place in Pennsylvania or in nearby New York, with both Mr. Lyampert and his British counterparts travelling here so I could help them conduct the meetings at my Southampton office or in its relative vicinity (i.e. in Philadelphia or, on two occasions, in New York). The anchor agreement that launched the commercial relationship, the Engagement Letter, was physically signed at my office in Pennsylvania, during Mr. Lyampert's fourth trip here, and before any of my trips to California. All payments for my work were received in Pennsylvania. Finally, when the Lyamperts repeatedly refused to cooperate in the dispute resolution process set by Section 12, and their lawyer Jeff Farrow stated that he would not cooperate in it, the coin-toss performed by George Bochetto fell in favor of Pennsylvania.

Ex. A ¶ 133.  Furthermore, the breach here—the failure to remit compensation—was felt in Pennsylvania, the place of the harm to Plaintiff.  *Id.*

A sufficient connection that satisfies venue can arise from in-person meetings in the district.  "We resolved the factual dispute of whether Fischbein met with Cozen in Philadelphia on one or more occasions in favor of Cozen. Thus, we find that at least one of the events related to this action happened in Pennsylvania, and therefore we disagree with Fischbein that the matter should be dismissed under Rule 12(b)(3)."  *O'Connor v. Fischbein*, No. 09-4931, 2010 WL 1053220, at *5 (E.D. Pa. Mar. 16, 2010).  As it is established that the parties met in this district to engage in the business they agreed to do together, as in *O'Connor*, there is no basis to dismiss under Rule 12(b)(3).  Furthermore, Defendants consented to Pennsylvania venue through the LTA when they agreed that the parties' counsel (one Pennsylvania attorney, one California attorney) would decide where any arbitration took place.

With respect to transfer of venue for forum non conveniens, this Court looks to the standard set forth in *Jumara v. State Farm Ins. Co.*:

> The private interests have included: plaintiff's forum preference as manifested in the original choice, 1A Pt. 2 Moore's ¶ 0.345[5], at 4363; the defendant's preference, 15 Wright, Miller &

Cooper § 3848, at 385; whether the claim arose elsewhere, id. § 3848; the convenience of the parties as indicated by their relative physical and financial condition, id. § 3849, at 408; the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, id. § 3851, at 420–22; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum), id. § 3853.

The public interests have included: the enforceability of the judgment, 1A Pt. 2 Moore's ¶ 0.345[5], at 4367; practical considerations that could make the trial easy, expeditious, or inexpensive, id.; the relative administrative difficulty in the two fora resulting from court congestion, id., at 4373; 15 Wright, Miller & Cooper § 3854; the local interest in deciding local controversies at home, 1A Pt. 2 Moore's ¶ 0.345[5], at 4374; the public policies of the fora, see 15 Wright, Miller & Cooper § 3854; and the familiarity of the trial judge with the applicable state law in diversity cases, *id.*

Within this framework, a forum selection clause is treated as a manifestation of the parties' preferences as to a convenient forum. Hence, within the framework of § 1404, Congress "encompasse[d] consideration of the parties' private expression of their venue preferences." *Stewart*, 487 U.S. at 29–30, 108 S.Ct. at 2244. Although the parties' agreement as to the most proper forum should not receive dispositive weight, id. at 31, 108 S.Ct. at 2245; *Red Bull Assocs. v. Best Western Int'l, Inc.*, 862 F.2d 963, 967 (2d Cir.1988), it is entitled to substantial consideration, *see Weiss v. Columbia Pictures Television, Inc.*, 801 F.Supp. 1276, 1278 (S.D.N.Y.1992) (quoting *Stewart*, 487 U.S. at 29, 108 S.Ct. at 2243).

55 F.3d 873, 879–80 (3d Cir. 1995).

Here, the parties created a forum selection clause with two default possibilities: a California attorney choosing a [California] venue and a Pennsylvania attorney choosing a [Pennsylvania] venue in this District.  Defendants were under no illusion that LSS would choose a local venue, which is the clear reason the LTA called for the coin flip. The Defendants and their attorney then refused to participate in the coin flip, along with good-faith negotiations and mediation, leaving the Plaintiff with no choice but to have the coin flip performed by its attorney instead. The coin flip is documented as having fallen in favor of the Plaintiff. Thus, the

Defendants consented to a Pennsylvania venue in this District, and this choice should be given proper deference.

Even if there were no forum selection procedure, the Defendants' *preference* is the only matter that weighs in favor of California.  The Defendants are sophisticated, able to do business across state lines and internationally (in fact, one of the Defendants, VRLA Tech, LLC, proudly states that it does business in 225 countries); Defendants have litigated extensively in England; books and records are more easily—and under the federal rules, sometimes more appropriately—transmitted electronically, easing any concern about their location; there is no issue of court congestion for this matter which must be arbitrated in any case; remote parties can easily participate in proceedings via video conference; and the harm occurred to a Pennsylvania business, and is felt in this District, an important factor requiring consideration.

For these reasons, the motion to dismiss or transfer based on venue should be denied.

## III.    Disqualification Is Not Justified or Appropriate to Defeat Plaintiff's Choice of Counsel

There is no basis for disqualification in this matter.  Defendants never retained Mr. Bochetto; they never provided him with confidential information; they understood Mr. Bochetto to be LSS's counsel, not their own counsel, in the LTA itself; and in Defendants' own words, this matter is unrelated to the alleged confidential meeting with Mr. Bochetto, which forms the only contact between Defendants and Mr. Bochetto: "Only Defendant Elena Lyampert visited Pennsylvania during a confidential ***meeting with Attorney Bochetto in Philadelphia, which forms no part of Plaintiff's allegations concerning the contract formation or breach***."  Def. Mot. to Dismiss at 14 (emphasis added).

18

On the basis of bills from LSS that describe "advance for possible **future** third-party costs expected to be paid by LSS on Arie's behalf, such as George Bochetto, Esq." and "Advance for third-party legal services on client's behalf (e.g., George Bochetto)[,]" Defendants seek to disqualify present counsel without any actual evidence that they retained Mr. Bochetto *at all or even in a related matter*.  They describe no work by George Bochetto after the bills, and as Mr. Bochetto and Mr. Mogilyansky state in their affidavits, no such work ever occurred, or was billed (either by Mr. Bochetto to Mr. Mogilyansky/LSS or by Mr. Mogilyansky/LSS to Defendants). Other than these bills—not from Mr. Bochetto and referring to **potential** future work (which never happened), not **actual** work performed prior to the bills (which even Defendants do not allege took place)—Defendants invent an attorney-client relationship from whole cloth where none ever existed.  Defendants point to no actual work performed or advice provided by Mr. Bochetto forming the basis of an attorney-client relationship.

### a. <u>Applicable Rules and Standards on a Motion to Disqualify</u>

The Local Rules of the United States District Court for the Eastern District of Pennsylvania incorporate the Pennsylvania Rules of Professional Conduct, which the Supreme Court of Pennsylvania has adopted. See E.D. Pa. Local R. 83.6(IV)(B).  The party seeking disqualification bears the burden of proving the clear need for disqualification with more than vague accusations.  *Regional Employers' Assur. Leagues Voluntary Employees' Beneficiary Ass'n Trust v. Castellano*, No. 03-6903, 2009 WL 1911671, at *2 (E.D. Pa. July 1, 2009).

Pennsylvania's Rules of Professional Conduct place conditions on representations by an attorney adverse to former clients.  The relevant Rule states:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse

19

to the interests of the former client unless the former client gives informed consent. . . .

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Pa. R.C.P. 1.9.[1]  The comments to the Rules define "substantially related:" "[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  *Id.* cmt. 3.

In deciding whether to disqualify an attorney under Rule 1.9, the Pennsylvania Superior Court requires (1) a past attorney/client relationship adverse to a subsequent relationship; (2) substantially related subject matter; and (3) that a member of the firm to be disqualified obtained actual or imputed confidential information of the former client.  *Estate of Pew*, 655 A.2d 521, 545 (Pa. Super. Ct. 1994).  In *Commonwealth Insurance Co. v. Graphix Hot Line, Inc.*, the Eastern District of Pennsylvania applied the following test for "substantial relationship:"

To perform a substantial relationship analysis under Rule 1.9 a court must answer the following three questions:

1. What is the nature and scope of the prior representation at issue?

2. What is the nature of the present lawsuit against the former client?

3. In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the

---

[1] Rule 1.10 is the imputed conflict rule; as there is no conflict of interest here at all, there is no conflict of interest to impute, and any separate application of Rule 1.10 would be unwarranted.

present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

808 F. Supp. 1200, 1204 (E.D. Pa. 1992).

### b.  **Defendants Cannot Show Any Element for Disqualification**

First, no attorney-client relationship ever existed between any Defendant and Mr. Bochetto.  The documents put forth by Defendants show only that LSS billed for a fund to be used to advance future costs and do not even state that work was done by Mr. Bochetto— because it never was.  Def. Mot. to Disqualify at Ex. E.  An attorney-client relationship requires the consent of both parties.  *Clark Capital Mgmt. Grp., Inc. v. Annuity Inv'rs Life Ins. Co.*, 149 F. Supp. 2d 193, 196 (E.D. Pa. 2001).  "An express attorney-client relationship is created with respect to a particular matter when a person manifests to a lawyer that person's intent that the lawyer provide legal services and the lawyer manifests to the person consent to do so."  *Speeney v. Rutgers*, 673 F. App'x 149, 153 (3d Cir. 2016) (unreported) (internal quotations omitted).  An implied relationship must be determined from the conduct of the parties.  *Clark Capital Mgmt. Grp., Inc.*, 149 F. Supp. 2d at 196.  Here there is no express agreement (in fact, there is a clear refusal by Mr. Bochetto to perform any work for the Defendants) and neither Defendants nor Mr. Bochetto operated so as to create a relationship; the facts are not even as convincing as in *Clark*, because Mr. Bochetto disclaimed any representation and no advice was ever sought or confidences directed at Mr. Bochetto.  *Id.*; Ex. B ¶¶ 29-30.  No attorney-client relationship ever existed between Mr. Bochetto and the Defendants.

Second, it is inconceivable that any communication or advice on the Pennsylvania real estate transaction—even if offered to the Defendants, which it was not—was substantially related to this dispute.  Defendants admit that Mr. Bochetto's communications with them were unrelated to the Complaint, to which no answer has been filed.  "Only Defendant Elena

Lyampert visited Pennsylvania during a confidential meeting with Attorney Bochetto in Philadelphia, which forms no part of Plaintiff's allegations concerning the contract formation or breach." Def. Mot. to Dismiss at 14.  The Complaint concerns breaches of the agreement between the parties to pay LSS for services rendered, ex. D at Counts I through VII, and thus this dispute **solely** concerns Defendants' failure to perform as required under the LTA.  Even where a prior attorney-client relationship existed, no substantial relationship can be found where the underlying facts are different; this Court has held no substantial relationship exists even for quite similar, though factually distinct, cases.  *See Graphix Hot Line, Inc.*, 808 F. Supp. at 1208 (two fire loss cases unrelated).  Here, Defendants cannot even allege what the nature and scope of Mr. Bochetto's prior representation was, and make no attempt to do so, noting that Mr. Bochetto's name appeared as a ***possible future payee*** on LSS invoices only, and fail to state any fact about advice or services received, or any engagement being entered into by Mr. Bochetto. Furthermore, in light of the admission that Mr. Bochetto's sole meeting with the Defendants is unrelated, there can be no finding that information could have been communicated to him relevant to this case.  There is no substantial relationship here.

Third, there is no confidential information that was exchanged.  Mr. Bochetto was in a meeting where no confidential information was shared between a potential mortgagor and a potential mortgagee. Ex. B ¶¶ 21-23.  Defendants sat silent during the meeting's relevant discussions. Ex. A ¶¶ 48-52.  Admitting that no confidential information was exchanged during the meeting, Defendants refer to no confidential information exchanged with Mr. Bochetto after the single meeting in April 2016 (Lyampert Aff. ¶ 9), and therefore fail to even try to demonstrate that Mr. Bochetto ever received any confidential information.  *Id.* ¶ 11.  This is because Defendants never relied on Mr. Bochetto for any advice. No communications between

Mr. Bochetto and Defendants exist, nor even any communications in Mr. Bochetto's e-mail archive that mention Defendants' names. Ex. B ¶¶ 46. It is inconceivable that Mr. Bochetto could have performed work on "simultaneous judicial proceedings against [Mr. Lyampert]" in the U.S. and the U.K. (as Mr. Lyampert alleges in his affidavit) and yet did not have a single communication with anyone mentioning Mr. Lyampert, nor billed anyone a single penny for such work. No assertion is made by Defendants that any one of their California or U.K. lawyers communicated with Mr. Bochetto, which is inconceivable if Mr. Bochetto was performing work on "simultaneous judicial proceedings," nor can they point to any communications between Mr. Mogilyansky and Mr. Bochetto made in the context of providing services to the Defendants. This is despite having been provided with a full 6,500-message archive of all Mr. Mogilyansky's communications relating to Defendants' U.S. and U.K. proceedings. As Mr. Bochetto and Mr. Mogilyansky both state, there were, in fact, no such communications, written or verbal. Mr. Bochetto was not even aware of the UK proceedings until the present proceedings were initiated in 2019. *Id.*¶ 45.  In the absence of any direct or indirect communications with Mr. Bochetto, there could be no exchange of confidential information at all; the allegations of the Defendants are the very definition of vague and unsupported allegations that cannot meet the standard for disqualification.  *Cohen v. Oasin*, 844 F.Supp. 1065, 1067 (E.D. Pa. 1994).

Fourth, the LTA discloses Mr. Bochetto as a party representative to conduct mediation and assist in selection of a forum.  Def. Mot. to Dismiss Ex. B ¶ 12.  The other attorney mentioned in the paragraph has represented Defendants.  *Id.*  Combined with Defendants' attempt to retain Mr. Bochetto, which was immediately rebuffed, Defendants were on notice that Mr. Bochetto was the attorney for Plaintiff and not themselves (rather, he would work **against** themselves) with respect to disputes arising under the LTA.  *Id.*  "'Informed consent' denotes the

consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  Pa. R.P.C. 1.0(e).  Here, the LTA itself is a writing and discloses the names of both attorneys, one well known to represent Defendants—Mr. Farrow— and the other known to be Mr. Mogilyansky's personal counsel at the time.  Def. Mot. to Dismiss Ex. B ¶ 12.  In this context, Defendants understood and expressly consented that Mr. Bochetto was the attorney mediating **for the other side** and choosing venue **for LSS** should that be required.  *Id.*  This was communicated adequately and in writing, and operates so as to waive any alleged issue with respect to disqualification.  The situation is more egregious than in *Graphix Hot Line, Inc.*, where delay was the reason for a finding of waiver; here, Defendants have been on notice for more than two years in the executed LTA that Mr. Bochetto is the opposing counsel.  808 F. Supp. at 1208 ("Waiver is a valid basis for the denial of a motion to disqualify."); *INA Underwriters Ins. Co. v. Nalibotsky*, 594 F.Supp. 1199, 1204 (E.D. Pa. 1984) (allowing waiver of conflict on written agreement).

Finally, with respect to the policy supporting the Rules, Defendants have clearly used this Motion to Disqualify Counsel as yet another thinly veiled attempt to avoid reaching a resolution in this dispute and creating further delay. They have used this Motion as a "procedural weapon," which directly contradicts established policies of this Court. *Wolf, Block, Schorr & Solis–Cohen LLP*, No. 05-6038, 2006 WL 680915, at *1 (E.D. Pa. Mar. 9, 2006) ("[M]otions to disqualify opposing counsel are disfavored . . . not only because disqualification robs one's adversary of her counsel of choice, but also because of the risk . . . that one could subvert the ethical rules in an attempt to use them as a procedural weapon.").  Here, where there is no scintilla of evidence offered as to any actual advice or exchange of confidential information, but simply a fund for

24

future costs being maintained by Plaintiff—in addition to no work done by Mr. Bochetto—

Plaintiffs are plainly engaging in procedural gamesmanship rather than protecting the interests of

attorney-client confidences.

For these reasons, the motion to disqualify should be denied.

## IV.    <u>Cross-Motion for Protective Order</u>

This Court should decide the issue of arbitrability first because in the absence of subject

matter jurisdiction, it cannot act in this matter.  The United States Supreme Court has recently

emphasized that the Federal Arbitration Act requires the arbitrator to decide threshold questions

under broad arbitration clauses, and a prior decision of this Court indicates that even where

personal jurisdiction does not exist, subject matter jurisdiction analysis requires that it be

exercised first.  Plaintiff therefore requests a protective order that the issue of the motion to

compel arbitration be decided first as it addresses the subject matter jurisdiction of this Court,

where if the entire dispute is sent to arbitration, this Court is divested of subject matter

jurisdiction.

The United States Supreme Court recently held that an agreement subject to arbitration

on the issue of arbitrability strips the Federal Court of power to resolve the dispute.

> Under the Federal Arbitration Act, parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract. When a dispute arises, the parties sometimes may disagree not only about the merits of the dispute but also about the threshold arbitrability question—that is, whether their arbitration agreement applies to the particular dispute. Who decides that threshold arbitrability question? Under the Act and this Court's cases, the question of who decides arbitrability is itself a question of contract. The Act allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes. . . . When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.

25

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 527–28, 202 L.Ed.2d 480 (2019) (internal citations omitted). Because the claims here must be submitted to Arbitration, the Court is without power to determine the merits of the underlying action.

The ruling in *Henry Schein*, which deprives courts of the power to decide matters of arbitrability, indicates that an arbitration provision is jurisdictional and not merely contractual. And in matters of jurisdiction, just as when a court shall dismiss an action when the parties lack diversity, dismissal in favor of an arbitration agreement that is brought to the attention of the court should be available at any time. See Fed. R. Civ. P. 12(h)(3).

This is in line with the rules issued by the foremost arbitration institutions, which allow arbitrators to decide threshold matters such as jurisdiction. See AAA Commercial Rule 7(a) (vesting the arbitrator with the "power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."); ICC Arbitration Rules, art. 6(3) (reserving for arbitrators resolution of any defense to the claims asserted based on "the existence, validity or scope of the arbitration agreement"); JAMS Rule 11(b) ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought … shall be submitted to and ruled on by the Arbitrator.").

Given the jurisdictional nature of the Henry Schein ruling, along with the ability of arbitrators to decide such threshold matters as jurisdiction, Plaintiff respectfully request that this Court decline to accept jurisdiction and allow this matter to proceed in arbitration.

Additionally, this Court faced a similar question in *Ziarno v. Gardner Carton & Douglas, LLP*.  No. 03-3880, 2004 WL 838131, at *3 (E.D. Pa. Apr. 8, 2004).  In *Ziarno*, the defendant law firm challenged subject matter and personal jurisdiction. *Id.* at *1-2.  The Court looked at

26

the issues, and decided that even though was skeptical that personal jurisdiction existed, subject

matter jurisdiction demanded dismissal of the case due to a clear agreement to arbitrate.  *Id.* *3.

Here, there is no dispute that an agreement to arbitrate exists under the LTA at paragraph 12, and

"[t]herefore the Court does not have subject matter jurisdiction over this claim at this time."  *Id.*

For these reasons, a protective order should issue requiring disposition of the motion to

compel arbitration first.

## <u>CONCLUSION</u>

For all the foregoing reasons, it is respectfully requested that Defendant's Motions to

Dismiss and Disqualify be denied, and that this Court should enter a protective order requiring

determination of the arbitration clause first.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Dated: May 5, 2019                    BY:    */s/ George Bochetto, Esquire*
                                             George Bochetto, Esquire
                                             1524 Locust Street
                                             Philadelphia, PA 19102

27

## <u>CERTIFICATE OF SERVICE</u>

I, George Bochetto, Esquire hereby certify that on May 2, 2019, I caused a true and correct copy of the foregoing document, together with all supporting papers, to be served via ECF upon all parties and counsel.

David W. Crossett, Esquire
Cornerstone Law Firm, LLC
8500 Allentown Pike, Suite 3
Blandon, PA 19510

**BOCHETTO & LENTZ, P.C.**

BY:     */s/ George Bochetto, Esquire*
        George Bochetto, Esquire
        David Heim, Esquire
        1524 Locust Street
        Philadelphia, PA 19102
        *Attorneys for Plaintiffs*